**BRANDI STEWART, Individually**
**and as Administrator of the Estate**
**of Samantha Ramsey,** *et al.*                                                    **PLAINTIFFS**

**v.**

**BOONE COUNTY, KY,** *et al*.                                                      **DEFENDANTS**

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

The Defendants, Tyler Brockman, individually and in his official capacity as a Boone County Deputy Sheriff; Boone County, Kentucky; and, Michael Helmig, in his official capacity as the Boone County Sheriff, by and through counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves this Court for summary judgment on Plaintiffs' claims because there is no genuine issue of material fact and he is entitled to judgment as a matter of law. A Memorandum in Support and proposed Order are attached.

Respectfully submitted,

*/s/ Jeffrey C. Mando*
Jeffrey C. Mando, Esq. (#43548)
Louis D. Kelly, Esq. (#92094)
ADAMS, STEPNER,
WOLTERMANN & DUSING, PLLC
40 West Pike Street
Covington, KY 41011
859.394.6200
859.392.7263 – Fax
jmando@aswdlaw.com
lkelly@aswdlaw.com

*Attorneys for Defendants, Tyler Brockman, individually and in his official capacity as a Boone County Deputy Sheriff; Boone County, Kentucky; and, Michael Helmig, in his official capacity as the Boone County Sheriff*

**CERTIFICATE OF SERVICE**

This is to certify that on the **31st** day of October, 2016 I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to: Alphonse A. Gerhardstein, Esq.; Colleen M. Hegge, Esq.; Gary F. Franke, Esq.; Michael O'Neill, Esq.; and, Ryan J. Reed, Esq.

*/s/ Jeffrey C. Mando*
Jeffrey C. Mando, Esq.

**BRANDI STEWART, Individually**
**and as Administrator of the Estate**
**of Samantha Ramsey,** *et al.*                                                      **PLAINTIFFS**

**v.**

**BOONE COUNTY, KY,** *et al*.                                                        **DEFENDANTS**

---

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

---

The Defendants, Tyler Brockman, individually and in his official capacity as a Boone County Deputy Sheriff; Boone County, Kentucky; and, Michael Helmig, in his official capacity as the Boone County Sheriff, by and through counsel, for their Memorandum in Support of their Motion for Summary Judgment, state as follows:

I.      **INTRODUCTION**

"While seated comfortably in a law office or judicial chambers, pondering the issues at one's own pace, it is difficult to adopt the officer's viewpoint in the circumstances faced by [the officer]." *Chaudoin v. Williamson*, 2015 U.S. Dist. LEXIS 20300 (W.D. Ky. Feb. 19, 2015).

The above statement, as expressed by United States District Court Senior Judge, Charles R. Simpson, III, is particularly pertinent in this case. In the early hours of April 24, 2014, Boone County Sheriff's Deputy Tyler Brockman was dispatched to a motor vehicle accident on KY Route 8, otherwise known locally as River Road. Little did Brockman realize that within minutes of this call he would find himself on the hood of an accelerating vehicle

1

traveling down a narrow, rural road towards pedestrians and fellow law enforcement officers. Faced with the belief that he had to take decisive action to save his own life and the lives of others, Brockman discharged his weapon four times into the windshield of the driver's car. The shots resulted in the death of the driver, Samantha Ramsey.

If ever there was a case where a law enforcement officer was forced to make a split-second decision in circumstances that were tense, uncertain, and rapidly-evolving, this would be it. Every day, we ask law enforcement to perform a dangerous job with dangerous people. The only way that officers, like Deputy Brockman, can do their job safely and effectively is to permit them to make judgment calls and use force where necessary to protect themselves and others.

As this Motion and the record demonstrate, Deputy Brockman did nothing more than protect himself and the public from a reasonably perceived and actual threat of serious harm when he shot Samantha Ramsey. His decision to use force was therefore permissible under the Fourth Amendment and Kentucky law.

## II.     STATEMENT OF THE FACTS

### A.     DEPUTY BROCKMAN'S DISPATCH TO RIVER ROAD AND HIS CONTACTS WITH TAYLOR PETTY, JERMAINE REESE, AND D'VONTAE BRADLEY

At approximately 1:00 a.m. on April 24, 2014, Deputy Tyler Brockman, a Deputy Sheriff for Boone County Sheriff's Office ("BCSO"), was dispatched to River Road in rural Boone County on a report of an accident. (Brockman Depo., p. 136) While turning onto the adjoining road, Tanner Road, Brockman observed a car full of teenagers; noting to himself how odd that was for that time of the early morning. (*Id*. at p. 137) Keeping this in mind, he drove down Tanner Road to where it meets River Road. As he approached River Road, Brockman heard unmistakable sounds of a party coming from the property located at 6661

River Road: music, talking, and several voices yelling; "Cops!" (*Id*. at p. 138) Brockman nevertheless continued on to the accident. (*Id*.)

As he turned onto River Road, Brockman encountered Taylor Petty on the side of the road, sitting on a bridge. (*Id*. at p. 138) River Road is a two lane state highway, has no shoulders, no sidewalk, and minimal to no lighting. Brockman was aware that two years earlier, in almost an identical situation, an individual had been struck and killed while walking, intoxicated, down the road. Accordingly, Brockman engaged Petty. (*Id*. at p. 139, Exh. 1, Wagner Investigation Narrative, p. 7) Petty told Brockman that he had just been at a field party, that he was intoxicated and underage, and that there were more minors at the party. (Brockman Depo., p. 139) Petty's account confirmed Brockman's suspicions about the car full of teenagers he had seen, and sounds of a party in the distance. (*Id*.)

At this point, other deputies arrived on River Road. (*Id*.) Brockman left Petty to another deputy and continued down the road to the original car accident he had been dispatched to handle. (*Id*. at p. 140) Again, before he was able to reach the accident, Brockman encountered Jermaine Reese walking down the road. (*Id*.; Exh. 1, p. 8) Reese was incredibly intoxicated, and said he had just come from "a bar." (*Id*. at p. 141) Knowing that there is no bar anywhere near the area, Brockman suspected Reese must have come from the party as well. (*Id*.) Brockman ran Reese's information and learned he had active warrants. (*Id*.) Reese allowed Brockman to arrest him peacefully, commenting; "you've been cool with me; I know you have to arrest me." (*Id*.)

At this time, Brockman's supervisor, Lt. Jeremy Reed, arrived on the scene. (*Id*. at p. 142) As they were talking near the roadway, a car stopped. (*Id*. at p. 143) One of the occupants of the vehicle, D'vontae Bradley, was a former student of Brockman's. (*Id*. at p.

144; Exh. 1, p. 22) Bradley stated that there was indeed a party up the road and that minors were consuming alcohol. (Brockman Depo., p. 143) He also stated that a fight had broken out. (*Id*.) Upon Brockman's request, Bradley consented to a preliminary breath test ("PBT") to ensure that he was not intoxicated. (*Id*.) The breath test indicated no presence of alcohol. (*Id*. at p. 144) Upon completion of the PBT, Lt. Reed directed Brockman and Deputy Jason Keipert, who had recently arrived on the scene, to go to the party at 6661 River Road while another Deputy checked on the car accident. (*Id*. at p. 146)

As Brockman and Keipert drove to the field party, they saw two or three individuals walking down the side of River Road. (*Id*. at p. 147) Brockman stopped again, knowing it was unsafe to walk down the road due to the lack of shoulders and poor lighting. (*Id*. at p. 147) The two individuals reported that they had been at the party, that there had been a fight, and that there was underage drinking. (*Id.* at p. 148) This was the third report of underage drinking, and second report of a fight at the party that Brockman received. Deputy Keipert gave the pedestrians a ride to their car further down the road so that they would not have to walk on the unsafe road. (*Id*. at p. 148)

Brockman proceeded to the party, with the intent of investigating the claims of underage drinking, fighting, and possibly trespassing. (*Id*. at p. 148) Brockman initiated his overhead lights to make it clear that there was a car on the road for any other potential pedestrians, and to indicate that the police were on the way to the party. (*Id*.) This activated his cruiser camera, which video recorded events from this point forward. (*Id*.)

B.      THE FIELD PARTY

When he first arrived at the scene, Deputy Brockman parked his car in the westbound lane of traffic, got out of his car, and approached a vehicle about to turn on to

the roadway. (*Id.* at p. 154) He instructed the vehicle to stop, and the driver complied. (*Id.*) Brockman asked the driver if he had been drinking, and conducted a very quick sobriety test. (*Id.* at p. 154 – 155) The driver stated that he had not been drinking and when Brockman did not see any signs of impairment, he waved the vehicle on and it left the scene. (*Id.*)

As the first vehicle departed, Matthew Martin engaged Brockman off to the right side of the camera. (*Id.* at p. 156) Martin, who was visibly, and admittedly, intoxicated, told Brockman that someone had stolen his cell phone. (*Id.* at p. 156) Brockman asked Martin questions, but was soon distracted by another driver approaching the exit to the property. (*Id.* at p. 156) During all of these interactions, Brockman is calm, collected, and fairly casual about his interactions. (See generally, Exh. 2, Brockman Cruiser Video at 2:12:38 – 2:13:07)[1] He was not aggressive, manic, or chaotic in any of his movements. (*Id.*)

**C.    SAMANTHA RAMSEY IGNORES DEPUTY BROCKMAN'S ORDERS TO STOP**

The driver of the approaching car, Samantha Ramsey, slowly approached River Road. In the car with her were Plaintiffs Tevin Harmon, Chelsea Pendleton, and Bobby Turner. (Exh. 2 at 2:13:01) Brockman instructed Ramsey to stop. (Brockman Depo., p. 158) He believed that Ramsey was going to stop her vehicle just like the previous driver did. (Exh. 3, Transcript of Brockman Interview, p. 55) Ramsey, however, did not comply. (Exh. 2 at 2:13:01 – 2:13:03) Brockman began backing up, toward River Road, in an attempt to regain Ramsey's attention. (Exh. 2 at 2:13:02) Ramsey looked west bound on River Road and then turned her head toward Brockman. (Exh. 2 at 2:13:03) Brockman knew immediately that something was not right with Ramsey; she was lethargic, her eyes were

---

[1] CD containing Exhibit 2, Brockman Cruiser Video, will be filed conventionally.

glassy, and she had a slow reaction time. (Brockman Depo., p. 159 – 160) Brockman believed she was intoxicated based on his observation and knowledge that partygoers had been drinking. (*Id.*)

Ignoring Brockman's commands to sop, Ramsey turned left east bound onto River Road. (Exh. 2 at 2:13:04) During this time, Brockman again ordered Ramsey stop. (Brockman Depo., p. 160) While Ramsey's car windows were rolled up, and the passengers in the car indicated that music was playing, Brockman's cruiser lights were illuminated and there was nothing to impede Ramsey's view of him. (Brockman Depo., p. 159, Harmon Depo., p. 116) In fact, Ramsey looked directly at Brockman as he held out his left hand in the ubiquitous gesture for her to "stop." (Exh. 2 at 2:13:04) Ramsey again did not comply. (*Id.*) Brockman continued to side step, still trying to gain Ramsey's compliance but, still looking at Brockman, she did not stop her car. (Exh. 2 at 2:13:03 – 2:13:07) Ramsey continued her left hand turn and as Brockman got closer to the window, he reached out and knocked on Ramsey's driver side window and yelled again for her to stop. (*Id*. at p. 173) At this point, Brockman and Ramsey were mere inches away from each other, and Ramsey looked directly into Brockman's face. (Exh. 2 at 2:13:07) Again, Ramsey did not comply. (*Id.*)  At this point, both Brockman and Ramsey leave the view of the cruiser camera video screen. (Exh. 2 at 2:13:08)

### D.    BROCKMAN ENDS UP ON THE HOOD OF RAMSEY'S VEHICLE

Ramsey continued driving toward Brockman, and around his cruiser, ignoring his directives to stop her car. (Brockman Depo., p. 175) As Ramsey accelerated, Brockman sensed that if he did not move, he was going to be pinned between her car and his cruiser.

In a split second, he decided to jump to avoid getting pinned. (*Id.*) As Brockman jumped up in the air, Ramsey struck him with her car, putting him on the hood. (*Id.*)

Witness statements obtained by BCSD following the incident corroborate Brockman's account that Ramsey accelerated her vehicle and struck Brockman prior to him ending up on the hood:

**Matthew Martin** (located Next to Brockman's Cruiser) (Exh. 4, Transcript of Martin Interview 1 and 2; Exh. 5, Map of Witness Locations):

> And she (Ramsey) kept like speeding up and like faster and faster. And then I don't know how it happened, but he ended up on the hood of the car. I guess she kind of like sped up too quick, and it kind of knocked him on the hood. (Exh. 4, Interview 1, p. 5)
>
> ...
>
> And that's when she sped up. I guess it like clipped his leg, and that's when he fell on the hood. And I guess he just braced himself so he wouldn't fall off. And that's when everything happened. (Exh. 4, Interview 2, p. 6)

**Aaron Brown** (driver of vehicle that pulled up to River Road behind Ramsey) (See Exh. 5; Exh. 6, Transcript of Brown Interview):

> Q.      Okay. Hold on. Hold on. So he was in front of the car?
>
> A.      Yeah.
>
> Q.      He was in the front of the car and she sped up –
>
> A.      Yeah.
>
> Q.      -- and hit him?
>
> A.      She sped up a little bit, yeah, and hit him.

**Josh Pitts** (located to the northeast of Brockman's Cruiser) (See Exh. 5; Exh. 7, Transcript of Pitts Interview):

> Yeah. He wasn't walking fast. She was like – this is the car, like, and she was on this side. Like, he was like this trying to tell her to stop. But once she hit the gas a little bit, he stepped back, and she steps on it again. And I guess – like when he got hit in his leg, he took a step and then he jumped on the car. (Exh. 7, p. 19)

**Alex Vallandingham** (located to the west of Brockman and Ramsey's vehicles) (See Exh. 5; Exh. 8, Transcript of Vallandingham Interview):

> I'm pretty sure he's right-handed, he was holding it (flashlight) like that trying to stop her. And seen her hit his foot, pulled his foot back, could tell that she's about to slam on that gas. She hits the gas and he's on that hood fast, like seen him leap on it and they went down the street. (Exh. 8, p. 9)

Not all witnesses interviewed by BCSO investigators recalled Brockman being struck by Ramsey's car. Ibrahim Konate ecalled Brockman telling Ramsey to stop her vehicle. (Exh. 9, Transcript of Konate Interview, p. 11) Konate recalled Ramsey started "pulling off" and "picking up speed." (*Id*. at p. 17 – 18) He estimated that Ramsey's car was traveling approximately 10 miles per hour when Brockman jumped on the hood. (*Id*. at p. 18) He said Ramsey's car continued to accelerate. (*Id*.) Konate said he did not believe Brockman was struck by Ramsey's vehicle prior to getting on the hood. (*Id*. at p. 30) Of all witnesses who said they observed the incident, Konate was the furthest away. (See Exh. 5)

### E. WHILE ON THE HOOD OF RAMSEY'S MOVING VEHICLE, BROCKMAN DISCHARGES HIS WEAPON

Once he was on the hood of Ramsey's car, Brockman had his knees underneath him, and was holding onto the windshield wiper well. (*Id*. at p. 180) Again, Brockman directed Ramsey to stop multiple times, but she did not comply. Instead, Ramsey continued eastbound down River Road, with Brockman on her hood. (Brockman Depo., p. 207) Brockman was able to look Ramsey directly in the eyes. (*Id*.) While Ramsey looked at him, both of her hands were on the steering wheel. (*Id*. at p. 215) Brockman also heard voices from inside the car yelling for Ramsey to stop. (*Id*. at 206)

Following the incident, Brockman gave two statements to the BCSO. The first was a written narrative that was taken immediately after he was released from the hospital on

April 26, 2014. In his statement, Brockman recalled his thoughts and actions while on the

hood of Ramsey's car, stating:

> Deputy Brockman was holding the hood with his left hand yelling for the
> Driver to stop. Deputy also heard nearby pedestrians pleading for the
> operator to just stop the vehicle. Deputy Brockman then heard the RPMs of
> the car begin to rise, felt the wind picking up on his back, and noticed the car
> was picking up speed. At this point Deputy Brockman knew the operator,
> Samantha Ramsey was about to kill him. Deputy Brockman, in reaction to the
> deadly force brought against him, drew his Glock 22 Service weapon and
> fired what he believed to be 3 shots (turned out to be 4) though the driver
> window. Deputy Brockman was face to face with the female as he was on the
> hood, and the side of the window where the female was looking out. The
> shots were fired not only to save his life, but also the pedestrians walking on
> the road and the officers currently just down the road initiating other arrests.
> (Exh. 10, Brockman Use of Force Narrative, p. 2 – 3)

On April 29, 2014, BCSO investigators formally interviewed Brockman and he again

recalled his thoughts and actions while on the hood:

> And I hear everybody on the side, the, well, the (inaudible) from the field
> party start yelling stop, please, stop for him, it's not worth it, just stop.
>
> And then I just hear the engine keep getting higher and it's revving and it's
> revving and I feel cold air, I feel the cold air on my back. And I feel the cold air
> on my back and I just know we're going. And at that point I go I'm going to
> die, she is about to kill me, I, I'm going to die. And, and I went, no, I'm not
> going to die here, I'm not going to die like this, I'm not going to die on River
> Road. And I was looking right at her, she was looking right at me. And I'm just
> thinking to myself, how, why is she still driving, she sees me on her hood.

(Exh. 3, p. 56 – 57) In both his deposition and interview, Brockman reiterated his fear for

his own life in addition to the safety of his fellow officers and other individuals on River

Road before deciding to discharge his weapon. (Brockman Depo., p. 235; Exh. 3, p. 89)

When asked how long he was on the hood, Brockman could not approximate the

time but said it "felt like an eternity." (Brockman Depo., p. 206) He was on the hood long

enough to take the flashlight from his right hand and place it back in the D-ring of the

flashlight holder; hear at least two cycles of the engine changing gear; reach down and push

the first retention on his weapon holster; push the second retention on his weapon holster; pull his weapon out of the locking device; and, point the weapon at the windshield. (*Id*. at p. 205)

### F. BROCKMAN IS THROWN FROM HOOD

After Brockman fired four shots, Ramsey's car jerked causing him to fall off the hood, land and immediately feel a sharp pain in his right foot. (Brockman Depo., p. 221) The car then began rolling backwards. (Brockman Depo., p. 224 – 225) The vehicle came to a stop in a ditch on the east bound side of the road with smoke billowing up from the car. (Exh. 2 at 2:13:56) Pendleton and Turner exited the vehicle with their hands raised on the roadway. (Exh. 2 at 2:14:03)

BCSO officers Reed and Keipert arrived on the scene shortly after Brockman's call of "shots fired." (Brockman Depo., p. 255) When they arrived, they saw Brockman sitting on the road next to his cruiser and Ramsey's car in a ditch. (Johnson Depo., p. 12) Two ambulances were dispatched, one for Ramsey and one for Brockman. (Johnson Depo., p. 13) EMTs from the first ambulance encountered Brockman, who directed them to Ramsey. (Johnson Depo., p. 13) When the EMTs arrived, Deputy Reed was performing CPR on Ramsey. (Johnson Depo., p. 13) EMTs from the second ambulance arrived and attended to Brockman. They determined that he had redness, swelling, and pain in his left ankle and foot. (Johnson Depo., p. 13) EMTs put him in a cast, and took him St. Elizabeth Edgewood. (Johnson Depo., p. 14) St. Elizabeth medical providers diagnosed Brockman with a displaced fracture of the fifth metatarsal. (Exh. 11, Smock 10.30.14 Report, p. 11) Samantha Ramsey was taken to St. Elizabeth Florence where she was pronounced dead at 4:00 a.m. (Exh. 12, Coroner's Authorization)

### G.    BCSO INVESTIGATION

Boone County Sheriff Michael Helmig ("Helmig") assigned Lt. Jim "Rocky" Wagner ("Wagner") to investigate the shooting. (Wagner Depo., p. 31) Before making the assignment, Helmig explicitly asked Wagner whether he had any conflicts in investigating Brockman; Wagner indicated he did not. (Helmig Depo., p. 59) Wagner was the head of the criminal investigations unit at the Sheriff's Department. (Wagner Depo., p. 7) Wagner assigned his detectives and deputies tasks to begin investigating the incident. (*Id*. at p. 44) Detectives at the scene took photographs, secured measurements, and interviewed witnesses. (Helmig Depo., p. 56 – 57)

#### 1.    Sheriff Helmig calls Kentucky State Police and forms independent review panel.

Following the shooting, Sheriff Helmig became aware of media criticism regarding his decision to allow his office to handle the investigation. (*Id*. at p. 65) While the Cincinnati Police Department and law enforcement agencies of size comparable to the BCSO handle their own investigations of officer involved shootings (*Id.* at 66), Helmig wanted to avoid even the appearance of impropriety, so he called the Kentucky State Police ("KSP") to ask if they would take over the investigation. (*Id*. at p. 66) KSP declined due to a new policy that they would only handle investigations that they had undertaken from the beginning. (*Id.*) KSP, however, offered their resources to the BCSO. (Wagner Depo., p. 48) While disappointed, Helmig determined that his office was large enough, sufficiently trained, and capable of handling the investigation. (Helmig Depo., p. 66) Helmig informed his investigators that he was willing to expend the amount of resources necessary to do the job to the best of the department's ability. (Wagner Depo., p. 49; Helmig Depo., p. 59)

Additionally, Helmig assembled a panel of detectives from the area to review the investigation. (Helmig Depo., p. 70) Florence Police Chief, John McDermod offered Sheriff Helmig the resources of his office. (Helmig Depo., p. 70) Together, they assembled a panel that consisted of Lt. Jason Reed of the Florence Police Department; Lt. Casey Kilgore and Lt. Rich Whitford of the Ft. Thomas Police Department, and Bill Wilson, a former Lt. with the Kenton County Police Department. (Jason Reed Depo., p. 19) The panel reviewed the BCSO's investigation for the purpose of ensuring that the investigation was thorough. (Jason Reed Depo., p. 15) During its review, the panel offered several suggestions such as to re-interview some witnesses, and to create a timeline of the day and night before the incident. (Jason Reed Depo., p. 39 – 41) The panel had full access to everything in the investigative file and the BCSO heeded all of the panel's suggestions. (*Id.*) Before the grand jury presentation, the panel was consulted and deemed they were satisfied that a thorough investigation took place. (Jason Reed Depo., p. 58)

### 2. Brockman's blood and urine samples.

Shortly after arrival on the scene, first responders transported Deputy Brockman to St. Elizabeth Hospital in Edgewood. Deputy Bill Samad was told to accompany Brockman at the hospital. (Samad Depo., p. 16) At the scene, Lt. Wagner asked Lt. Reed to call Samad and make sure that the hospital drew Brockman's blood for testing. (Wagner Depo., p. 123) Reed relayed the request and also directed Samad to ensure that Brockman's urine was tested as well. (Samad Depo., p. 25) Samad requested that the hospital test Brockman's urine and blood. (*Id.*) Initially the hospital stated that they do not do law enforcement blood tests, but ultimately agreed to draw and test Brockman's blood. (*Id.*) After leaving the

hospital, Brockman went immediately to the Boone County Sheriff's Department where he gave another urine sample for independent testing. (Brockman Depo., p. 281)

The screen performed on Brockman's urine taken at St. Elizabeth indicated a presumptive positive for benzodiazepine with a minimum reference threshold of 200 nanograms per milliliter. (Smock Depo., p. 148) The blood that was drawn from St. Elizabeth was tested for alcohol – which was negative – but was not tested for drugs. (*Id.* at p. 148 – 149) When Lt. Wagner learned that Brockman's blood was not tested for drugs, he asked Detective Bradley Hanlon to contact St. Elizabeth to see if they still had Brockman's blood sample so that it could be further tested. (Wagner Depo., p. 127) Hanlon contacted St. Elizabeth but they informed him that Brockman's blood samples had already been discarded. (Hanlon Depo., p. 30)

Brockman's primary physicians prescribed Xanax,[2] a benzodiazepine, to treat anxiety and to help him sleep. (Brockman Depo., p. 52) Brockman's physicians initially prescribed Ambien, but changed the prescription to Xanax specifically so that it would not stay in his system as long. (*Id.*) Consistent with BCSO policy, Brockman informed his supervisors of the medications he was taking and also disclosed it to the physicians who gave him his annual work physical. (*Id.* at p. 123 – 125) And, Brockman never went to work within twelve (12) hours of taking the medication. (*Id.* at p. 28)

Consistent with that practice, Brockman ingested one Xanax prior to going to sleep on the early morning hours of April 25, 2014 after completing his shift at work. (*Id.* at p. 169) Under these circumstances, the Xanax did not have any adverse impact on Brockman at the time of the shooting. (Exh. 13, 08.10.16 Report of Michael Ward) Indeed, none of the

---

[2] Brockman was technically prescribed Alprazolam, which is a generic form of Xanax. For purposes of convenience, Defendants will refer to his prescription as Xanax in this Motion.

officers or individuals that Brockman encountered on April 26, 2014 stated that he showed any signs of impairment or that he was under the influence.

### 3.    Statements from Pendleton, Harmon, and Turner.

Immediately following the shooting, BCSO investigators interviewed Chelsey Pendleton, Tevin Harmon, and Bobby Turner. Pendleton stated that they all, including Ramsey, had smoked marijuana approximately one hour before arriving at the party. (Exh. 14, Transcript of Pendleton Interview, p. 9) She also statted that they were all sharing a bottle of vodka. (*Id*. at p. 8) She said that they continued drinking at the party. (*Id*. at p. 5) They decided to leave the party when they heard the police were coming. (*Id*. at p. 10) They got in Ramsey's vehicle and intended to just sit in the car for a moment because they were "obviously all intoxicated." (*Id*. at p. 5) When asked about Ramsey's level of intoxication, Pendleton stated, "…she was pretty drunk. She was like as drunk as I was, so I was pretty drunk." (*Id*. at p. 15) Pendleton said Ramsey became nervous when she saw that the police had arrived.[3] (*Id*.) Pendleton did not observe or recall what happened prior to Brockman ending up on the hood of the car. (*Id*.) However, Ramsey "kept on going" while Pendleton repeatedly told her to stop. (*Id*. at p. 6) She also recalled that Ramsey's foot was on the gas as the car began moving in reverse and ultimately stopped. (*Id*. at p. 6, 16)

Harmon had active warrants for his arrest on the night of the incident. (Exh. 16, Transcript of Harmon Interview, p. 1 – 3) He further stated that he and the three other individuals were drinking and smoking marijuana before the field party. (*Id*. at p. 12) They continued drinking when they arrived at the party and became intoxicated. (*Id*.) Harmon said that the group decided to leave the party because they knew the police were coming.

---

[3] Ramsey was 19 years old with already one previous conviction for Driving under the Influence in Kenton County in 2013. See attached Exh. 15.

(*Id*. at p. 13) He did not know if Ramsey struck Brockman prior to him ending up on the hood. (Harmon Depo., p. 118) However, after ending up on the hood of Ramsey's car, Harmon recalled that Brockman continued to yell for Ramsey to stop the car. (Exh. 16, p. 20) He also recalled that he and the other passengers were telling her to stop. (*Id*.) After Ramsey was shot and the car came to a stop, Harmon got out of the car ran in an attempt to flee the scene. (Harmon Depo., p. 130, 135)

Bobby Turner recalled drinking alcohol and smoking marijuana at the field party. (Exh. 17, Transcript of Turner Interview, p. 7 – 8) He said that the group decided to leave the party before the police arrived. (*Id*. at p. 13) Turner was carrying marijuana in his pants. (Turner Depo., p. 67) He was on his phone as Ramsey began driving and did not see how Brockman got on the hood of the car. (Exh. 17, p. 10, 14) After the shots were fired, Ramsey was "trying to reverse or something" and that the car started going backwards. (*Id*. at p. 15) Turner also said that Brockman fired his weapon because "he (Brockman) thought he was going to get hurt," and "If I was in his situation, I would have done the same thing." (*Id*. at p. 39)

### 4. Other steps taken during BCSO investigation.

Following the shooting, BCSO conducted an exhaustive investigation that spanned several months. The investigation included, but was not limited to:

- Interviewing individuals present on the night of the incident (See, generally, Exh. 1);

- Interviewing EMS and first responders (*Id.* at p. 19);

- Developing a 3D-image scan of the crime scene for accident reconstruction(*Id*. at p. 2);

- Processing Ramsey's vehicle (*Id*. at p. 14);

- Asking KSP Lt. Chad Mills to conduct an accident reconstruction (*Id*.);

- Retaining a certified mechanic to perform a mechanical inspection of Ramsey's vehicle (*Id*. at p. 16);

- Utilizing drones to obtain aerial photography of the scene (*Id*. at p. 17);

- Coordinating with KSP labs for potential forensic evidence on Ramsey's vehicle (*Id*. at p. 18);

- Obtaining and reviewing Brockman's medical records (*Id*. at p. 26);

- Performing a 3D scan of Ramsey's vehicle (*Id*. at p. 28);

- Coordinating with KSP Trace Analyst Laura Mosenthin to obtain photographs and paint samples from Ramsey's vehicle (*Id*. at p. 28);

- Obtaining and reviewing Brockman's training records (*Id*. at p. 41);

- Obtaining and reviewing a frame-by-frame analysis of Brockman's cruiser camera (*Id.* at p. 41 – 42);

- Examining light measurements and overnight conditions at 6661 River Road (*Id.* at p. 43);

- Photo documentation and obtaining measurements of Brockman and his equipment (*Id.* at p. 44);

In addition, Special Prosecutor James Crawford retained Louisville Metro Police Surgeon William Smock, M.D., to perform a forensic medical analysis of the evidence. (Smock Depo., p. 47) In addition to reviewing the relevant evidence, reports, and medical records, Smock performed exemplar reconstructions of the shooting. (Exh. 11, p. 2) As part of his analysis, Dr. Smock noted that Ramsey's toxicology reports from the night of the shooting indicated the presence of tetra hydra cannabinoids (THC) and a blood/alcohol level of .120. (*Id*. at p. 24) Based upon these levels, Smock opined that Ramsey was under the influence and impaired by the combined use of marijuana and alcohol on the night of the shooting. (*Id*. at p. 25) He further opined that the presence of pseudo tattooing on the dorsal surface of Ramsey's arms from glass fragments was consistent with her arms being

on or close to the steering wheel at the time the bullets penetrated the windshield. (*Id*. at 26) Finally, Dr. Smock opined that Brockman's lower extremities and boots indicated physical contact with Ramsey's vehicle. (*Id*.)

On November 6, 2014, the results of the BCSO investigation were presented to a special grand jury in Boone Circuit Court. (Crawford Depo., p. 44) After reviewing the investigation, the grand jury issued a no-true bill. (Brockman Depo., p. 270)

When the criminal investigation was initiated, Sheriff Helmig assigned Josh Quinn, a Lt. in the administrative unit, to conduct an administrative investigation to determine whether or not Brockman had violated any BCSO policies. (Helmig Depo., p. 76) Quinn consulted with several outside law enforcement agencies to determine how they conducted their OIS investigations. (*Id.*) However, before the termination of the criminal investigation, Quinn was assigned to the FBI joint terrorism task force. (Helmig Depo., p. 76) Sheriff Helmig, therefore, waited until the criminal investigation was complete and conducted his own administrative review. (*Id*.) After reviewing the complete BCSO criminal investigation, he determined that Brockman had not violated any BCSO policies or practices. (*Id*. at p. 78 – 79)

On April 15, 2015 Brandi Stewart, individually and as administrator of the Estate of Samantha Ramsey, Tevin Harmon, Bobby Turner and Chelsea Pendleton, filed this 42 U.S.C. § 1983 action claiming Defendants violated their Fourth and Fourteenth Amendment rights. They also asserted state law claims for wrongful death, assault and battery, and intentional and negligent infliction of emotional distress.

III.    **DEPUTY BROCKMAN IS ENTITLED TO QUALIFIED IMMUNITY FOR HIS DECISION TO ATTEMPT TO STOP RAMSEY'S VEHICLE**

Qualified immunity shields police officers and other government officials from liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223 (2009). A qualified immunity inquiry involves two questions: whether the defendant in question violated a constitutional (or federal statutory) right, and whether that right was clearly established at the time of the defendant's conduct. *Id.*

When a defendant raises qualified immunity in the context of a summary judgment motion, the court must analyze these questions after construing the facts in the light most favorable to the plaintiff and drawing all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372 (2007). These questions may be answered in any order the court wishes; if either one is answered in the negative, then qualified immunity protects the defendant from civil damages. *Pearson*, *supra*. However, "the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Binay v. Bettendorf*, 601 F.3d 640 (6th Cir. 2010).

Under this standard, Deputy Brockman is entitled to qualified immunity and, therefore, summary judgment, in connection with his decision to attempt to stop Ramsey's vehicle.

A.    **DEPUTY BROCKMAN DID NOT VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS BY ATTEMPTING TO STOP RAMSEY'S VEHICLE**

Under the Fourth Amendment, a police officer may stop a person – including a person in a vehicle – if he can point to specific and articulate facts which give rise to a reasonable suspicion that the person is, has been, or plans to be involved in, criminal

activity. *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Lyons*, 687 F.3d 754 (6th Cir. 2012). Although less demanding than the probable-cause standard, the reasonable-suspicion standard requires more than a mere hunch. *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008) (internal quotation marks omitted). It requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the detention of a motorist in connection with a traffic stop. *United States v. Ellis*, 497 F.3d 606, 612-13 (6th Cir. 2007). In conducting a reasonable-suspicion analysis, reviewing courts must look at the totality of the circumstances of each case to see whether the officer has a particularized and objective basis for suspecting legal wrongdoing, while bearing in mind that officers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. *Id.* at 613 (internal quotation marks omitted). This totality-of-the-circumstances inquiry requires courts to determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately. *United States v. Perez,* 440 F.3d 363 (6th Cir. 2006).

To the extent Plaintiffs claim that Deputy Brockman violated their Fourth Amendment rights by attempting to stop them in the first place, Brockman is entitled to summary judgment because (a) a seizure did not occur initially because Ramsey never stopped her vehicle; and (b), even if Brockman could be said to have seized Ramsey's vehicle, he had a reasonable suspicion that Ramsey and/or her passengers had engaged in criminal activity.

### 1. There was no seizure because Ramsey never stopped.

It is axiomatic that the Fourth Amendment is not triggered unless and until there is a seizure. U.S. Const. Amend. IV. And, it is well-established that a seizure does not occur for Fourth Amendment purposes if a suspect does not stop in response to a show of authority on the part of law enforcement. The United States Supreme Court has said: "A police officer may make a seizure by a show of authority and without the use of physical force, *but there is no seizure without actual submission* [on the part of the suspect]; *otherwise, there is at most an attempted seizure*, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249 (2007) (emphasis added). <u>*Accord*</u> *U.S. v. Martin*, 399 F.3d 750 (6th Cir. 2005) ("When a suspect refuses to submit to a show of authority by the police, the suspect is not seized by the police until such time as he or she submits or is forced to submit to police authority."); *U.S. v. Ray*, 597 Fed. Appx. 832 (6th Cir. 2015) (no seizure when an officer yells "stop" at a fleeing suspect); *U.S. v. Bobo*, 2 Fed. Appx. 401 (6th Cir. 2001) (suspect who flees is not seized until he is physically apprehended); *U.S. v. Thomas*, 77 Fed. Appx. 862 (6th Cir. 2003) (suspect not seized until he complies with an officer's order to stop); *U.S. v. Williams*, 949 F.2d 220 (6th Cir. 1991) (an officer yelling "halt" does not constitute a seizure until the suspect actually stops); *U.S. v. Seymour*, 739 F.3d 923 (6th Cir. 2014) (passenger not seized when he jumped out of fleeing vehicle and ran because the passenger did not submit to a show of police authority).

In the present case, Ramsey did not stop when Deputy Brockman initially ordered her to do so. Consequently, there was not a seizure until Brockman fired his weapon and forcibly stopped Ramsey's vehicle. During his interview with BCSO, Tevin Harmon acknowledged that Ramsey never stopped the vehicle prior to being shot. (Exhibit 16,

Transcript of Harmon Interview, p. 14)   Indeed, Plaintiffs' own expert, Ron Martinelli, concedes as much. He testified as follows:

> Q:     All right. So with Samantha Ramsey there was no seizure until the shots were fired on the roadway, correct?
>
> A:     Correct, because she had never effected a full and complete stop. It was an attempted seizure.

(Martinelli Depo., p. 86)

Because Ramsey never stopped her vehicle until Brockman forced her to do so by firing his weapon, there was no seizure prior to that point. Consequently, to the extent Plaintiffs claim that Brockman violated their Fourth Amendment rights by attempting to stop them in the first place, Brockman is entitled to summary judgment

### 2.     Assuming *arguendo* there was a seizure, the seizure was supported by reasonable suspicion.

Assuming *arguendo* that Deputy Brockman effected a seizure of Plaintiffs merely by ordering Ramsey to stop her vehicle, that seizure was supported by reasonable suspicion.

It is unlawful for a person under the age of 21 to possess alcoholic beverages. KRS 244.085(3). It is also unlawful for a person under the age of 21 to operate a motor vehicle with a blood alcohol concentration of .02 or more. KRS 189A.010(1)(f). And, it is unlawful for anyone to be in possession of marijuana, KRS 218A.1404(2), much less to drive under its influence. KRS 189A.010(1)(c). Based on information he received from others, Ramsey's youthful appearance and that of her passengers, and Brockman's own observations of Ramsey, Brockman had more than enough reason to suspect that Ramsey and/or her passengers had engaged in such activity in violation of KRS 244.085(3), 189A.010(1)(f), 218A.1404(2), and/or 189A.010(1)(c).

Specifically, while on his way to the scene of an accident, Brockman observed that there was a party going on in the 6600 block of River Road. As he drove his cruiser in that vicinity, he heard loud music, talking, and people yelling "cops." (Brockman Depo., p. 137 – 138) Because he had just seen a car full of teenagers driving up Tanners Road, and there being no other reason for teenagers to be in that particular area of Boone County at 1:00 a.m. on a Saturday, Brockman surmised there were teenagers at the party. (Brockman Depo., p. 137 – 138)

As he continued toward the accident to which he had been dispatched, Brockman saw a teenager who appeared to be 18 or 19 sitting in dangerous proximity to the roadway. He stopped his cruiser to talk with the teenager, who said his name was Taylor Petty. In the course of their discussion, Brockman learned Petty had just left the party Brockman had noticed in driving through the 6600 block of River Road; that Petty had consumed alcohol at the party; and that, according to Petty, everyone else at the party was drinking alcohol, too. (Brockman Depo., p. 138 – 139)

Brockman continued toward the accident to which he had been dispatched and encountered an obviously intoxicated man stumbling as he walked on the wrong side of the road and who was not easily visible given the poor lighting in the area. Brockman stopped to speak with that man, who turned out to be Jermaine Reese. (Brockman Depo., p. 140 – 142)

As Brockman spoke with Reese, he yelled at a passing car to slow down, and the car came to a complete stop next to his cruiser. Brockman recognized the driver, D'vontae Bradley, as a former student of his from his prior career as a teacher at Cooper High School. Brockman and Bradley had a conversation in which Bradley told Brockman he had decided

to leave the party down the road because there was underage drinking and fighting. Brockman administered a preliminary breathalyzer test to Bradley, which showed no signs of alcohol, so he allowed Bradley to leave. (Brockman Depo., p. 142 – 144)

One of the three people he had spoken with up to that point – but Brockman did not specify which one – also mentioned the presence of marijuana at the party. (Brockman Depo., p. 146, 167)

When other officers arrived to deal with the accident to which he had originally been dispatched, Brockman drove to the party, parked his cruiser, and got out. As he was standing outside his cruiser, he saw Ramsey driving a car and approaching the roadway from a gravel driveway on 6661 River Road, with the apparent intent of leaving the party. (Brockman Depo., p. 158 – 160) As Ramsey's vehicle approached the road, Ramsey turned her head to the left, looking in the direction of Brockman, who was standing just a few feet away. (Exh. 2 at 2:13:01 – 2:13:05) Brockman observed that Ramsey had glassy, watery eyes and slow, lethargic reactions. (Brockman Depo., p. 158 – 160)

In light of the information that others had provided to Brockman about the presence of alcohol and marijuana at the party, Ramsey's age and that of her passengers, and Brockman's own observations of Ramsey when she approached the road, Brockman had more than enough reason to suspect that Ramsey and/or her passengers were minors in possession of alcoholic beverages, in violation of KRS 244.085(3). In light of that same data, Brockman had more than enough reason to suspect that Ramsey and/or her passengers were in possession of marijuana in violation of KRS 218A.1404(2). And, in light of that same data, Brockman had more than enough reason to suspect that Ramsey was a minor operating a motor vehicle with a blood alcohol concentration of .02 or more, in violation of

KRS 189A.010(1)(f), or that she was operating a vehicle under the influence of marijuana, in violation of KRS 189A.010(1)(c).

Thus, to the extent that Plaintiffs' Fourth Amendment claim is based on the alleged impropriety of the initial attempt to stop Ramsey's vehicle, Brockman is entitled to summary judgment because he had reasonable grounds to suspect that Ramsey and/or her passengers had engaged in criminal activity.

### B. PLAINTIFFS DID NOT HAVE A CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT NOT TO BE STOPPED UNDER THE CIRCUMSTANCES OF THIS CASE

Assuming *arguendo* that Brockman did not actually have reasonable suspicion, he is nevertheless entitled to qualified immunity and, therefore, summary judgment, on this claim.

The test for qualified immunity, as set forth herein, is meant to be highly deferential to government officials, protecting "all but the plainly incompetent or those who knowingly violate the law." *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). In keeping with that high degree of deference, the official in question is entitled to qualified immunity unless the right is so clearly established that ***every reasonable official*** would have understood that his or her conduct violated an individual's constitutional right. *Ashcroft v. al-Kidd,* 563 U.S. 731, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011); *Meadows v. Enyeart,* 2015 FED App. 0672N at *11 (6th Cir.); *Gradisher v. City of Akron,* 794 F.3d 574, 583 (6th Cir. 2015); *Webb v. United States,* 789 F.3d 647, 659 (6th Cir. 2015); *Meeks v. Larsen,* 611 Fed. Appx. 277, 282 (6th Cir. 2015); *Bolick v. City of E. Grand Rapids,* 580 Fed. Appx. 314, 322 (6th Cir. 2014).

Clearly established law should not be defined with a high level of generality; the general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established. *Ashcroft v. Al-Kidd*, 563 U.S. 731 (2011). Rather, before it can be said that every reasonable official would have understood that his or her conduct violation an individual's constitutional right, the contours of the right in question must be sufficiently defined to give a reasonable officer fair warning that the conduct at issue was unconstitutional. *Baynes v. Cleland*, 799 F.3d 600 (6th Cir. 2015). That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be beyond debate. *Hope v. Pelzer*, 536 U.S. 730 (2002); *Hearring v. Sliwowski*, 712 F.3d 275 (6th Cir. 2013). The burden of demonstrating that the unlawfulness of a defendant's action is beyond debate in the light of pre-existing law falls on the plaintiff. *Binay*, *supra*.

As of April 24, 2014, the lack of reasonable suspicion under the circumstances of this case was not so obvious that every reasonable officer would have recognized that Ramsey had a right not to be stopped. To the contrary, if reasonable suspicion does not actually exist under the circumstances of this case, then there is at least room for disagreement as to whether reasonable suspicion exists to support an investigatory stop when an underage motorist leaves a party at which widespread consumption of alcohol and marijuana have been reported and where the motorist displays signs of intoxication.

Because Plaintiffs' right not to be stopped while leaving the party in question was not clearly established, Brockman is entitled to qualified immunity in connection with his decision to attempt to stop Plaintiffs in the first place.

## IV. DEPUTY BROCKMAN IS ENTITLED TO QUALIFIED IMMUNITY FROM FOURTH AMENDMENT LIABILITY FOR HIS USE OF FORCE AGAINST RAMSEY

Under the standard previously set forth herein, Brockman is entitled to qualified immunity and, therefore, summary judgment, in connection with his decision to use deadly force against Ramsey.

### A. DEPUTY BROCKMAN DID NOT USE EXCESSIVE FORCE

A claim that a law enforcement officer used excessive force – deadly or otherwise – is properly analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386 (1985). To decide whether the force used was reasonable, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake. *Id.* This standard demands "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

In applying the reasonableness standard, a court engages in an objective inquiry. The question is whether the officer's actions were objectively reasonable in light of the facts and circumstances that confronted him at the time he used the force in question. *Id.* The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* The Court thus allows for the fact that police officers are often forced to make split-second

judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation. *Id.* "What constitutes reasonable action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992).

With respect to the use of deadly force on a fleeing suspect, the Fourth Amendment does not permit a police officer to seize a suspect by shooting him where the suspect does not pose a threat of serious harm to the officer or anyone else. *Tennessee v. Garner*, 471 U.S. 1 (1985). However, where the officer has probable cause to believe that the suspect poses a threat of serious physical harm – either to the officer himself or to others – it is reasonable to prevent escape by using deadly force. *Id.*; *Brosseau v. Haugen*, 543 U.S. 194 (2004).

Applying this standard in the context of moving vehicles, the Sixth Circuit has held that an officer is justified in using deadly force against a driver who appears to pose an immediate threat to the officer's safety or the safety of others – for example, a driver who objectively appears ready to drive into an officer or bystander with his car. *Hermiz v. City of Southfield*, 484 Fed. Appx. 13 (6th Cir. 2012). <u>*Accord*</u> *Cass v. City of Dayton*, 770 F.3d 368 (6th Cir. 2014); *Williams v. Grosse Pointe Park*, 496 F.3d 482 (6th Cir. 2007); *Hocker v. Pikeville City Police Department*, 738 F.3d 150 (6th Cir. 2013).

In *Cass*, for example, police officers were watching a drug buy in a hotel parking lot when the suspected drug dealer got "spooked" and attempted to leave the location in his vehicle.  One of the police officers blocked the parking lot's exit, got out of his cruiser, and approached the suspect's car from the front with his service weapon drawn and ordered the suspect to stop his car. Another officer who has arrived on the scene did the same thing. The suspect momentarily stopped his car, but when the first officer got within ten feet of

his car, he punched the gas and accelerated. Realizing he could not avoid being hit, the first officer placed his hands on the hood of the suspect's vehicle and jumped in the air to avoid having the car drive over his body, but nonetheless was struck in the leg. The first officer ended up rolling across the hood of the suspect's car and landed on passenger side of the vehicle, as the car continued to accelerate. Mistakenly believing that the second officer was now in danger of being struck by the car (the second officer had managed to move out of the car's direct path), the first officer shot at the car to protect the second officer. A passenger in the suspect's vehicle was struck by the first officer's bullet, killing him. Because the first officer "reasonably believed [the second officer] to be in the direct path of the" suspect's vehicle, the Sixth Circuit ruled that the first officer did not use excessive force in shooting at the suspect's vehicle.

Likewise, in *Williams*, *supra*, where a police officer shot the driver of a moving vehicle that endangered a fellow officer, the police officer was held not to have used excessive force. In that case, the two officers who had briefly chased a suspect were able to position their cruisers in a manner that trapped the suspect's vehicle. Video from the incident showed that, in an effort to escape, the suspect placed his car in reverse, backed into one of the police cruisers at the scene, and stopped briefly. One of the officers approached the suspect's car with his service weapon drawn and stuck his gun in the driver's side window. In another attempt to escape, the suspect then accelerated and drove over a curb onto a sidewalk. Since the first officer had not yet released his grasp on the suspect's car, the car's acceleration knocked him down and placed him in immediate danger from the suspect's moving car. In that instant, the second officer fired several rounds at the car, one of which struck the suspect in the neck and paralyzed him. Under

those circumstances, the Sixth Circuit ruled that the second officer did not use excessive force.

The Sixth Circuit reached the same conclusion in *Hocker*. There, a suspect led two officers on a chase before pulling into a gravel driveway. The officers pulled their cruisers in behind the suspect's vehicle, got out of their cruisers, and took up protective positions behind the open doors of their respective cruisers. The suspect put his car in reverse and rammed the first officer's cruiser hard enough to push it back thirty feet, momentarily trapping the first officer's arm between the door and the body of his cruiser, forcing the second officer to backpedal to avoid being struck by the first officer's sliding cruiser, and causing each officer to be uncertain as to the location of the other. As they were both moving out of the way of the first officer's sliding cruiser, the officers opened fire on the suspect's vehicle. The suspect filed suit, claiming that neither of the officers was actually in harm's way at the time they fired shots, such that the shooting constituted excessive force. The Sixth Circuit rejected that argument, explaining: "It is not that easy, particularly in the context of the lightning quick evolution of this encounter. It is undisputed that neither officer knew where the other one was when they began firing. That one officer was safe does not mean the other one was. This reality by itself justified the officers' conduct. While it may be easy for Hocker to say that each officer was safe once the officer was no longer in the direct path of Hocker's vehicle, no reasonable officer would say that the night's peril had ended at that point. Hocker remained in the car … . Only Hocker's self-restraint stood in the way of further threats to their safety. From the officers' reasonable perspective, the peril remained."

While a police officer may shoot at a driver who appears to pose an immediate threat to the officer's safety or the safety of others, an officer may not, as a general rule, use deadly force on a suspect whose car has moved away, leaving the officer and bystanders in a position of safety. *Hermiz*, *supra*. <u>*Accord*</u> *Lewis v. Charter Twp. of Flint*, 2016 U.S.App. LEXIS 15628 (6th Cir.); *Godawa v. Byrd*, 798 F.3d 457 (6th Cir. 2015); *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005). For example, the officers in *Lewis*, *Godawa*, and *Cupp*, all shot into the side or rear windows of the vehicles driven by the suspects in those cases. That indicated to the Sixth Circuit that the suspects' vehicles had likely already passed by the three officers involved in those cases, such that the officers were no longer in imminent danger at the time shots were fired. Thus, in each of those cases, the Sixth Circuit ruled that the suspects may be able to establish that the officers had used excessive force, leaving that determination ultimately to juries.

In the present case, a reasonable jury could only find that Ramsey posed an immediate threat to Brockman's safety. In the span of less than one minute[4], all of the following occurred:

Based on what he knew about the party and on his observations of Ramsey as she approached River Road, Brockman reasonably suspected that Ramsey was drunk and/or high on marijuana. (Brockman Depo., p. 158 – 160) That suspicion turned out to be true, Ramsey's blood-alcohol concentration was .148 and she had marijuana in her system. (Exh. 18, Ramsey Toxicology Report) And, Chelsey Pendleton, said Ramsey had smoked marijuana within an hour of going to the party, had been drinking from a bottle of vodka

---

[4] Ramsey's car first appears in the Cruiser Video at 2:13:01, and one of her passengers re-entered the Cruiser Video on foot at 2:13:56. While the shooting occurred off-screen, Ramsey was obviously shot sometime between 2:13:01 and 2:13:56.

while at the party, and described Ramsey as "pretty drunk" when they left the party together. (Exh. 14, p. 5, 8, 9, 15; Pendleton Depo., p. 97 – 98)

When Brockman attempted to stop Ramsey before she exited the driveway of 6661 River Road by ordering her to stop, she turned left despite his efforts. (Exh. 2 at 2:13:01 – 2:13:03; Brockman Depo., p. 158) Ramsey, who was looking to her left, saw Brockman, who was in uniform, standing in front of his cruiser with flashing overhead lights, and within a few feet of the left (driver's) side of her vehicle. (*Id.*)

Believing Ramsey would ultimately stop, Brockman continued to engage her. (Brockman Depo., p. 189) Brockman repeatedly attempted to stop Ramsey by walking briskly toward her car, yelling for her to stop, gesturing for her to stop, and knocking on the driver's side window of her car with his flashlight to ensure he had her attention. (Exh. 2 at 2:13:03 – 2:13:07; Brockman Depo., p. 173) Despite these efforts, Ramsey did not comply.

As Ramsey continued driving with Brockman following beside her car on foot, he jumped straight up in the air to avoid being pinned between Ramsey's car and his own cruiser, but was struck by Ramsey's car and knocked onto the hood. (Brockman Depo., p. 175 – 178) Witness statements and photographs of his injuries support that testimony. (Exh. 4, Interview 1, p. 5; Exh. 6, p. 16 – 17; Exh. 7, p. 19; Exh. 8, p. 9; Exh. 11)

While Ramsey contends that Brockman jumped up with the intention of landing on the hood, it is quite beside the point. It is undisputed that Brockman was on the hood of Ramsey's car and she accelerated. It is equally undisputed that Brockman heard the revving of Ramsey's engine, felt cold air at his back, and noticed the car picking up speed. (Exh. 3, p. 56 – 57; Exh. 10; Brockman Depo., p. 211, 214) Chelsey Pendleton, one of Ramsey's passengers, said: "I don't know if she hit him or if he jumped on the [hood] or what, but

that's when she just kept going … ," even though "everybody was just saying stop." (Exh. 14, p. 12 – 13) Per Tevon Harmon, Ramsey's "foot was on the gas" after Brockman was on the hood. (Exh. 16, p. 14 – 15) And, a pedestrian at the scene, Matthew Martin, said: "And then I don't know how it happened, but he ended up on the hood of the car. Guess she kind of like sped up too quick, and it kind of knocked him on the hood. But as soon as that, she sped up real fast … ." (Exh. 4, Interview 1, p. 5, 11) As she was accelerating, Brockman and the passengers were yelling for Ramsey to stop but she refused. (Exh. 14; Exh. 16, p. 20; Brockman Depo., p. 206 – 207)

The immediate threat that being on the hood of a moving, accelerating vehicle poses to a person's safety is self-evident. Thus, it is no surprise that Brockman feared for his safety and, in fact, for his life. (Brockman Depo., p. 235) He feared being thrown off the vehicle if Ramsey had sped up any faster or if she would have turned the wheel. (*Id.*) He also feared Ramsey would hit someone else, such as one of the officers who was down the road at the accident scene to which he had originally been dispatched, or pedestrians leaving the party and walking on River Road to get to their cars. (*Id.*; Exh. 10, p. 2 – 3) Brockman explained: "And then I just hear the engine keep getting higher and it's revving and it's revving and I feel cold air, I feel cold air on my back. And I feel the cold air on my back and I just know we're going. And at that point, I go I'm going to die, she is about to kill me, I, I'm going to die. And, and I went, no, I'm not going to die here. I'm not going to die like this, I'm not going to die on River Road. And I was looking right at her, she was looking right at me. And I'm just thinking to myself, how, why is she still driving, she sees me on her hood." (Exh. 3, p. 56 – 57)

Under these circumstances, Brockman's decision to use deadly force to end the threat that Ramsey posed to his safety and the safety of others was reasonable under all three *Graham* factors. At the moment Brockman decided to use deadly force, he had reason to believe she had committed one less serious offense – i.e., being a minor in possession of alcohol – and two more serious offenses – i.e., driving under the influence and assaulting a police officer by striking him with her vehicle, which is a violation of KRS 508.025(a). Ramsey posed a significant and immediate threat to the safety of Brockman and others, as demonstrated herein. And, she was actively attempting to flee.

Plaintiffs contend that the force Brockman used was not reasonable because he created the threat to his own safety by jumping onto the hood of Ramsey's moving vehicle. Assuming *arguendo* the truth of that contention, it does not diminish the reasonableness of Brockman's decision to use deadly force. A tactical or procedural error that results in an officer being placed in a dangerous position does not negate that officer's right to use reasonable force to defend himself while in that dangerous position. *City & County of San Francisco v. Sheehan*, 135 S.Ct. 1765 (2015). *See also Cupp*, *supra* (an officer "is constitutionally permitted to put himself in a dangerous position to effectuate an arrest"); *Cass*, *supra* (fact that officer violated departmental policy by placing himself in the direct path of a moving vehicle did not negate officer's right to use deadly force to defend himself); *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002) ("the fact that an officer negligently gets himself into a dangerous situation will not make it unreasonable for him to use force to defend himself"); *Vann v. City of Southaven*, 2016 U.S.Dist. LEXIS 105607 (N.D.Miss.) (that an officer placed himself in the path of an oncoming vehicle did not deprive the officer of the right to use reasonable force to defend himself once he was in that

position). Moreover, the Court "must avoid substituting [its] personal notions of proper police procedure for the instantaneous decisions of the officer at the scene." *Freland*, *supra*. Therefore, even if Brockman was on the hood of Ramsey's car because he jumped on it, his decision to use deadly force once he found himself in that position does not affect the reasonableness inquiry. And, under that inquiry, Brockman's decision to use deadly force was reasonable under all of the circumstances that confronted him.

Plaintiffs are also expected to rely heavily on the fact that, after Brockman's use of force, Ramsey's vehicle was found to be in "reverse" – an indication, according to Plaintiffs, that Ramsey was in the process of stopping at the moment Brockman fired his weapon. Again, assuming *arguendo* that Ramsey was in fact in the process of stopping at the moment Brockman used deadly force against her, his decision to use deadly force was still reasonable. Up to the point at which Brockman used deadly force, Ramsey had consistently and repeatedly refused his instructions to stop her car. She even continued to ignore his – and others' – pleas to stop after Brockman was on the hood of her car, thereby placing Brockman in the utmost danger. *If* Ramsey had at some point decided to stop on her own, she did nothing to convey that decision to Brockman, who cannot be expected to have read her mind. *Wylie v. Overby*, 2006 U.S.Dist. LEXIS 29845 (E.D.Mich.) ("no reasonable officer would be expected to read plaintiff's mind and instantly know that what had theretofore been plaintiff's attitude of insolence, struggle and flight had suddenly become cooperation, surrender and peace"). <u>Accord</u> *Jones v. Sandusky County*, 541 Fed. Appx. 653 (6th Cir. 2013) (the relevant question "is whether a reasonable officer in [defendants]' shoes would have feared for his [or someone else's] life, not what was in the mind of [the decedent] ... ."); *Hocker v. Pikeville City Police Dept.*, 738 F.3d 150 (6th Cir. 2013) ("The question is not [the

plaintiff's] state of mind. It is whether a reasonable police officer could perceive [the plaintiff's] actions as so dangerous as to warrant the force used."). Because Brockman had no knowledge of any intention on Ramsey's part to stop her vehicle, evidence of her alleged intent cannot factor into the reasonableness inquiry – an inquiry which must adopt a reasonable officer's perspective on the facts known to him at the time force was employed. *Graham*, *supra*.

In short, Brockman made a split-second decision to use deadly force against Ramsey under tense, uncertain, and rapidly evolving circumstances. As demonstrated herein, that decision was reasonable, considering the facts and circumstances confronting Brockman at the time he made the decision to use such force, even though it resulted in the unfortunate, untimely death of Ramsey.

## B. ASSUMING, *ARGUENDO*, THAT RAMSEY HAD A RIGHT NOT TO BE SUBJECT TO DEADLY FORCE UNDER THE CIRCUMSTANCES OF THIS CASE, THAT RIGHT WAS NOT CLEARLY ESTABLISHED ON APRIL 24, 2014

As of April 24, 2014, Ramsey did not have a clearly established right not to be subject to deadly force under the circumstances of this case.

The test for qualified immunity, as set forth herein, is meant to be highly deferential to government officials, protecting "all but the plainly incompetent or those who knowingly violate the law." *Humphrey*, *supra*. In keeping with that high degree of deference, the official in question is entitled to qualified immunity unless the right is so clearly established that ***every reasonable official*** would have understood that his or her conduct violated an individual's constitutional right. *Ashcroft*, *supra*; *Meadows*, *supra*; *Gradisher*, *supra*; *Webb*, *supra*; *Meeks*, *supra*; *Bolick*, *supra*.

Clearly established law should not be defined with a high level of generality; the general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established. *Ashcroft*, *supra*. Rather, before it can be said that every reasonable official would have understood that his or her conduct violates an individual's constitutional right, the contours of the right in question must be sufficiently defined to give a reasonable officer fair warning that the conduct at issue was unconstitutional. *Baynes*, *supra*. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be beyond debate. *Hope*, *supra*; *Hearring*, *supra*. The burden of demonstrating that the unlawfulness of a defendant's action is beyond debate in the light of pre-existing law falls on the plaintiff. *Binay*, *supra*.

Here, assuming *arguendo* that the force Brockman used against Ramsey was excessive, Plaintiffs cannot show that the unlawfulness of Brockman's actions is beyond debate in light of pre-existing law. The crux of Plaintiffs' argument that Brockman used excessive force appears to be that Brockman allegedly jumped onto the hood of Ramsey's vehicle in an effort to force her to stop, even though he, allegedly, "was never in the direct path of the vehicle" prior to doing so. (R.1 Complaint at PageID 2, 6) Plaintiffs theorize that the force Brockman used was automatically excessive because Brockman created the need to use such force by placing himself in a dangerous position. Presumably, Plaintiffs intend to rely on *Lewis*, *supra*, *Godawa*, *supra* and *Cupp*, *supra* as establishing that the unlawfulness of Brockman's actions was clearly established prior to April 24, 2014. But, even if those

cases provided a foundation for the argument that some proposition of law was clearly established prior to April 24, 2014[5], they stand for a far different proposition than the one Plaintiffs rely on in the present case. Specifically, those cases stand for the proposition that a police officer cannot use deadly force to stop a vehicle after the vehicle has already passed him, such that he is in a position of relative safety at the time he used deadly force – a factual scenario that does *not* exist in the present case. *Lewis*, *Godawa*, and *Cupp* actually *do not* support the proposition that Plaintiffs claim is clearly established, i.e., that it is constitutionally impermissible for a police officer to use deadly force after he places himself in a risky position. Indeed, *no case* supports that proposition.

In fact, it would be exceedingly difficult for police officers to accomplish arrests if they were *not* permitted to place themselves in dangerous positions to do so.  In every encounter between a police officer and a resistant criminal, there comes a point at which the police officer must put himself in a dangerous position to continue his efforts to effectuate the arrest. If police officers were not permitted to place themselves in dangerous positions to effectuate arrests, enterprising criminals would quickly learn that the best way to evade arrest is to escalate an encounter with a police officer until the officer cannot prevent the criminal's escape without putting himself in a dangerous position. For that reason, case law specifically recognizes that it is "constitutionally permissible for a police officer to put himself in a dangerous position to effectuate an arrest." *Cupp*, *supra*.

And, if a police officer is constitutionally permitted to put himself in a dangerous position to effectuate an arrest, it necessarily follows that a police officer who has done so has the right to use reasonable force to effectuate that arrest, or to defend himself in the

---

[5] Lewis and Godawa were not decided until 2016 and 2015, respectively, and, therefore, as a matter of logic cannot support the proposition that any principle of law was clearly established prior to April 24, 2014.

event that it becomes necessary to do so. Precedent (including at least one case from the Sixth Circuit) supports an officer's right to use reasonable force to defend himself in an encounter with a suspect, even where the officer has placed himself in a dangerous position in the course of that encounter. *See* City & Cnty. of San Francisco v. Sheehan, 135 S. Ct. 1765 (2015); *Cass*, *supra* (fact that officer violated departmental policy by placing himself in the direct path of a moving vehicle did not negate officer's right to use deadly force to defend himself); *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002) ("the fact that an officer negligently gets himself into a dangerous situation will not make it unreasonable for him to use force to defend himself"); *Vann v. City of Southaven*, 2016 U.S.Dist. LEXIS 105607 (N.D.Miss.) (that an officer placed himself in the path of an oncoming vehicle did not deprive the officer of the right to use reasonable force to defend himself once he was in that position).

In *Sheehan*, *supra*, police officers were called to a group home for mentally ill adults to assist a social worker in dealing with a resident who had barricaded herself in her room and threatened social workers with a knife. On arriving at the home, the officers opened the door to the resident's unit. When the resident threatened them, they shut the door. Believing the resident was a threat to them, to the social worker and to the general public in the event she left the home via her unit's fire escape, the officers opened the door and pepper-sprayed the resident. That did not deter her, and she advanced on the officers with a knife. The officers then shot her. The resident filed suit against the officers, alleging that they had used excessive force against her. In support of her claims, the resident alleged that the officers had violated their training and proper police protocol in dealing with the mentally ill. Assuming the officers had violated their training and appropriate protocol, the

Supreme Court ruled that the officers were nonetheless entitled to qualified immunity, explaining: "[E]ven if [the officers] misjudged the situation, [the resident] cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided. Courts must not judge officers with "the 20/20 vision of hindsight." *Sheehan*, *supra*, citing *Billington*, *supra*.

Therefore, rather than establishing that the force used by a police officer is excessive if that police officer creates the need to use force by placing himself in a dangerous situation, the case law actually supports the opposite proposition. Either way, it is far from clearly established that a police officer, such as Brockman, cannot use force to defend himself when, in the course of an encounter with a suspect, he, according to Plaintiffs, placed himself in harm's way.

Because it is not clearly established that Brockman used excessive force under the circumstances of this case, he is entitled to qualified immunity from Fourth Amendment liability for his decision to deploy deadly force against Ramsey.

## V. WHETHER OR NOT DEPUTY BROCKMAN IS ENTITLED TO SUMMARY JUDGMENT, BOONE COUNTY AND SHERIFF

Whether or not Brockman is entitled to summary judgment, Boone County and Sheriff Helmig[6] are entitled to summary judgment on Plaintiffs' § 1983 claims.

### A. BOONE COUNTY PROPERLY TRAINED DEPUTY BROCKMAN

The Supreme Court has recognized that a failure to train may, *under limited circumstances*, form the basis for liability under § 1983. *City of Canton v. Harris,* 489 U.S. 78 (1989). Specifically, "only where a municipality's failure to train its employees in a relevant

---

[6] Sheriff Helmig is sued only in his official capacity. Claims against government officials in their official capacities are equivalent to claims against the government itself. E.g., *Ky. v. Graham*, 473 U.S. 159 (1985).

respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* To successfully rely on an alleged failure to train as the basis for imposing liability on a government under § 1983, a plaintiff must point to a particular deficiency in the training of government employees. *Id.* A plaintiff must show:

> ... in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need ... The focus must be on adequacy of the training program in relation to the task the particular officers must perform.

*Id.* Thus, a failure-to-train theory cannot succeed absent proof regarding the nature of the training a government entity provided its employees; such training must then be scrutinized to determine its adequacy in relation to the tasks the employees are expected to perform. *Id.*

In the present case, Plaintiffs fault Boone County for allegedly failing to train Brockman on the conduct of traffic direction; foot pursuits of vehicles; stopping vehicles; and conducting sobriety checkpoints. (R.1, Complaint ¶ 58) However, Boone County provided Brockman with training that was adequate in relation to the tasks Brockman is expected to perform as a patrol deputy. Boone County has provided Brockman with substantial training, including 768 hours of basic training at the Kentucky Department of Criminal Justice Training in 2010; 4 additional hours of training in 2010 in the operation of breath test apparatus; 58 hours of in-service training in 2011, including 16 hours in Advanced Roadside Impaired Driving Enforcement; 57.5 hours of in-service training in 2012, 8 of which focused on the operation of breath test apparatus and 40 of which focused on the use of a handgun on patrol; 40 hours of in-service training in 2013, all of which dealt

with controlled substance investigations; and 4 hours of in-service training in 2014 (prior to the use of force on Ramsey). (Exh. 19, Brockman Record of Training) In addition, Brockman was thoroughly trained in the use of force. (Exh. 20, Brockman Use of Force Training) Given all of his training, particularly the training that focused on use of force and alcohol and drug impairment, Brockman was sufficiently trained for his duties as a patrol deputy. And, because Plaintiffs have not adduced any evidence to suggest that the training afforded Brockman was somehow inadequate for that purpose, Boone County is entitled to summary judgment on Plaintiffs' § 1983 municipal liability claim.

### B. BOONE COUNTY AND SHERIFF HELMIG CONDUCTED A THOROUGH AND APPROPRIATE INVESTIGATION INTO BROCKMAN'S USE OF FORCE

Plaintiffs also contend that Boone County "ratified" Brockman's allegedly excessive use of force "by failing to conduct a meaningful investigation, conducting an investigation that is designed to avoid discovering the truth, and by not disciplining Brockman ... ." (R.1 Complaint at PageID 9)

Where, as here, municipal liability is premised upon an allegedly faulty investigation, the plaintiff "must show not only that the investigation was inadequate, but that the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which the Department knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the Department's custom was the cause of the shooting here." *Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005). *See also Skovgard v. Pedro*, 448 Fed. Appx. 538 (6th Cir. 2011); *Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013); *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989). Deliberate indifference in this context "does not mean a collection of sloppy, or even

reckless oversights; it means evidence showing an obvious, deliberate indifference" to the alleged violation." *Thomas, Id.*

Given this standard, it is not surprising that, "in cases where an investigation has been conducted, courts have been reluctant to impose municipal liability based on a ratification theory." *Woodcock v. City of Bowling Green,* 165 F. Supp. 3d 563 (W.D.Ky. 2016) ("Plaintiff may not agree with the outcome of the investigation, but it is undisputed that an investigation was conducted. … Plaintiff has failed to show that the KSP investigation was so inadequate as to constitute a ratification of Casada's alleged use of excessive force."). See also *Daniels v. City of Columbus,* 2002 U.S. Dist. LEXIS 28130 (S.D. Ohio Feb. 20, 2002) ("Ms. Daniels may not agree with the outcome of Sergeant Williams' investigation, and may believe that her complaint was not taken as seriously as she thought it should have been. Nevertheless, it is undisputed that an investigation was conducted."); *Anthony v. Vaccaro,* 43 F. Supp. 2d 843, 848 (N.D. Ohio 1999) (no municipal liability based on ratification theory where government officials conducted investigation of alleged misconduct); *Walker v. Norris,* 917 F.2d 1449, 1457 (6th Cir. 1990) (distinguishing *Marchese v. Lucas,* 758 F.2d 181 (6th Cir. 1985) on the basis that investigation was conducted in present case).

In the present case, Plaintiffs cannot make the showing required by *Thomas*, *supra*.

First, while Plaintiffs are clearly dissatisfied with the outcome of Boone County's investigation, it can hardly be said that the investigation was inadequate. To the contrary, the BCSO undertook the following tasks as part of its investigation:

- Secured blood and urine samples from Brockman immediately after the shooting (Samad Depo., p. 16, 25; Wagner Depo., p. 123; Brockman Depo., p. 281);

- Secured written statements from Ramsey's passengers immediately after the shooting (Exh. 21, Passenger Statements);

- Secured written statements from as many partygoers and bystanders as could be identified (Exh. 22, Witness Statements);

- Gained consent to search, and did search, phones belonging to Ramsey, her passengers, and some partygoers and bystanders (Exh. 23, Consent to Search);

- Interviewed Ramsey's passengers (Exh. 14, 16, 17);

- Interviewed as many partygoers and bystanders as could be identified, some more than once (See generally, Exh. 1);

- Interviewed first responders (Exh. 1, p. 19);

- Conducted a 3D-image scan of the crime scene for accident reconstruction (Exh. 1, p. 2);

- Fully processed Ramsey's vehicle (Exh. 1, p. 14);

- Arranged for Kentucky State Police Lt. Chad Mills to reconstruct the scene of the shooting (Exh. 1, p. 14);

- Arranged for a certified mechanic to perform a mechanical inspection of Ramsey's vehicle (Exh. 1, p. 16);

- Obtained aerial photographs of the scene utilizing drones (Exh. 1, p. 17);

- Coordinated with Kentucky State Police laboratories for potential forensic evidence on Ramsey's vehicle (Exh. 1, p. 18);

- Obtained and reviewed Brockman's medical records (Exh. 1, p. 41);

- Performed a 3D scan of Ramsey's vehicles (Exh. 1, p. 28);

- Coordinated with Kentucky State Police Trace Analyst Laura Mosenthin to obtain photographs and paint samples from Ramsey's vehicle (Exh. 1, p. 28);

- Obtained and reviewed Brockman's training records (Exh. 1, p. 41);

- Obtained and reviewed a frame-by-frame analysis of Brockman's cruiser camera (Exh. 1, p. 41 – 42);

- Examined light measurements and overnight conditions at 6661 River Road (Exh. 1, p. 43);

- Photo documentation and obtaining measurements of Brockman and his equipment (Exh. 1, p. 44);

- At the behest of Special Prosecutor James Crawford, had an expert – Dr. William Smock – perform medical and forensic analysis and conduct exemplar reconstructions of the shootings (Smock Depo., p. 47; Exh. 11)

In addition, the Sheriff's Department assembled a panel of detectives from other local law enforcement agencies – including Florence Police Chief John McDermod, Lt. Jason Reed of the Florence Police Department, Lt. Casey Kilgore and Lt. Rich Whitford of the Fort Thomas Police Department, and Bill Wilson, formerly of the Kenton County Police Department – to review its investigation and ensure the investigation was as thorough as possible. (Helmig Depo., p. 70, Jason Reed Depo., p. 15, 19) The panel made suggestions – such as re-interviewing certain witnesses and constructing a timeline – and Boone County heeded all of those suggestions. (Jason Reed Depo., p. 39 – 41) Before this case was presented to the Boone County grand jury, the Sheriff's Department consulted the panel of detectives to determine whether it was satisfied that a thorough investigation had taken place. (Jason Reed Depo., p. 58) Thus, Plaintiffs cannot demonstrate, as they are required to under *Thomas, supra*, that Boone County's investigation was inadequate.

Moreover, assuming *arguendo* there was any flaw in the investigation, Plaintiffs cannot establish that the flaw is representative of a clear and persistent pattern on the part of Boone County of ratifying the use of excessive force by its sheriff's deputies; nor that Boone County policymakers knew about that non-existent pattern; nor that Boone County policymakers were deliberately indifferent to that non-existent pattern. Absent such evidence, Plaintiffs cannot establish liability on the part of Boone County. *Thomas, supra.*

For all of these reasons, Boone County is entitled to summary judgment on Plaintiffs' federal claims.

## VI. DEPUTY BROCKMAN AND BOONE COUNTY ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' STATE LAW CLAIMS

Plaintiffs Harmon, Turner and Pendleton assert state-law causes of action against Deputy Brockman – for which they claim Boone County is liable under a theory of respondeat superior – for assault and battery, intentional infliction of severe emotional distress, and negligent infliction of severe emotional distress. (R.1 Complaint at PageID 11 – 12) For the following reasons, Deputy Brockman and Boone County are entitled to summary judgment on those claims.

### A. DEPUTY BROCKMAN DID NOT COMMIT ASSAULT AND BATTERY ON HARMON, TURNER, OR PENDLETON

Assault occurs when one person intentionally places another in reasonable apprehension of imminent bodily harm, and battery is the intentional *unlawful* touching of another person without her consent. *Vitale v. Henchey,* 24 S.W.3d 651 (Ky. 2000). It is not unlawful, however, for a police officer to do either of those things in the course of performing his official duties, unless the police officer uses excessive force to accomplish a legitimate law enforcement objective. *See Maggard v. Commonwealth,* 22 S.W.2d 298 (Ky. 1929); *Collett v. Commonwealth,* 176 S.W.2d 893 (Ky. 1943); *Palmer v. Commonwealth,* 252 S.W.2d 677 (Ky. 1952); *Keyes v. Commonwealth,* 114 S.W.2d 742 (Ky. 1937); *Ali v. City of Louisville,* 2006 U.S. Dist. LEXIS 66426 (W.D.Ky.) (interpreting Kentucky law); *Turner v. Hill*, 2014 U.S. Dist. LEXIS 16669 (W.D.Ky.) (interpreting Kentucky law). In other words, when an assault and/or battery claim is asserted against a police officer, excessive force is an element of the tort because, in order to meet his burden of establishing that the touching was "unlawful," a plaintiff must show that the force a police officer used in touching him or placing him in fear for his safety was excessive. Logically, then, a plaintiff cannot prove

assault or battery against a police officer without proving that the officer used excessive force.

As demonstrated herein, Brockman did not use excessive force in attempting to stop Ramsey's vehicle. As such, he did not commit assault or battery against Harmon, Pendleton or Turner, who were the passengers in Ramsey's vehicle.

**B.    HARMON, TURNER, AND PENDLETON CANNOT PREVAIL ON THEIR OUTRAGE CLAIM**

Harmon, Turner and Pendleton cannot prevail on their outrage claim because (a) that claim is subsumed by their other claims, and (b) they cannot, in any event, establish the elements of intentional infliction of severe emotional distress, or "outrage."

**1.    Plaintiffs' outrage claim is subsumed by their other claims.**

Plaintiffs assert a cause of action for outrage. At the same time, however, they also assert causes of action under 42 U.S.C. § 1983 and Kentucky law that permit recovery of damages for emotional distress. For this reason alone, Plaintiffs cannot maintain an outrage claim. *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295 (Ky. App. 1993). In *Rigazio*, the court said:

> ...where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie. Recovery for emotional distress in those instances must be had under the appropriate traditional common law action. The tort of outrage was intended to supplement the existing forms of recovery, not swallow them up.

The tort of outrage is intended as a "gap-filler" tort. It allows for recovery of damages for emotional distress only when no other cause of action allows the recovery of such damages and when the elements of outrage can otherwise be established. *Id.* Since Plaintiffs have asserted claims for unlawful seizure, negligent infliction of severe emotional

distress, and assault and battery, all of which allow for the recovery of emotional distress damages, they cannot also recover against Brockman under the tort of outrage.

> **2. Harmon, Turner and Pendleton cannot establish the elements of outrage.**

In prosecuting an outrage claim, a plaintiff must demonstrate that the defendant engaged in conduct that was "intentional" in the sense that the conduct was intended to cause the plaintiff emotional distress, or conduct that was "reckless" in the sense that the defendant intended his specific conduct and either knew or should have known that severe emotional distress would result. *Craft v. Rice*, 671 S.W.2d 247, 249 (Ky. 1984); *Burgess v. Taylor*, 44 S.W.3d 806 (Ky. App. 2001). In this case, there is no evidence that Brockman engaged in such conduct. Specifically, there is no evidence that Brockman intended to cause any of the Plaintiffs emotional distress. Nor is there any evidence that Brockman engaged in any conduct that he knew or should have known would cause Plaintiffs to experience severe emotional distress. Rather, Brockman was performing his duties as a police officer, which, unfortunately, led him to use reasonable force against Ramsey while Plaintiffs were passengers in her car. Brockman was not required to know that his reasonable use of force against Ramsey would cause Plaintiffs to experience severe emotional distress. Hence, because Plaintiffs cannot establish the requisite intent on Brockman's part, they cannot satisfy the elements of an outrage claim as a matter of law.

In addition, Plaintiffs cannot establish that Brockman engaged in any extreme and outrageous conduct. To prevail on an outrage claim, a plaintiff must show that the defendant's conduct was so outrageous and intolerable that it offends generally accepted standards of morality and decency. *Craft*, *supra*. The extreme and outrageous character of the conduct arises where the wrongdoer knows that the other person is peculiarly

susceptible to emotional distress, by reason of some physical or mental condition or peculiarity, but proceeds in the face of such knowledge. *Kroger Co. v. Willgruber*, 920 S.W.2d 61 (Ky. 1996).

In *Willgruber*, for example, Kroger fired an emotionally unstable employee and attempted to induce him to sign a paper releasing all claims against the company arising out of his termination, despite the knowledge that plaintiff was "mighty sick, mighty upset" over the manner in which he had been terminated. In an attempt to obtain the plaintiff's signature, the company repeatedly told the plaintiff it would consider him for a position in a company-owned plant, knowing that no such position was available. The company even arranged for the plaintiff to interview for the nonexistent job. On returning from the interview, the plaintiff suffered a disabling nervous breakdown, yet the company continued to pressure the plaintiff to sign the release. To increase the pressure on the plaintiff, the company interfered with his application for disability insurance benefits to which he was clearly entitled by advising the insurance agent that the plaintiff was feigning illness, telling the agent that the plaintiff was working "under the table" for another company, and saying things about the plaintiff and his family that the court deemed "so derogatory...that they are unworthy of repetition in a published opinion." The court held that such conduct was extreme and outrageous.

By contrast, a high school student had no cause of action for outrage arising from an incident whereby his teacher chained him to a chair to prevent him from skipping school. *Banks v. Fritsch*, 39 S.W.3d 474 (Ky. App. 2001). In addition, a garnishment proceeding which was improperly handled did not rise to the level of extreme and outrageous conduct,

even though the garnishing entity should have known that garnishment was improper. *Ky. Farm Bureau Ins. Co. v. Burton*, 922 S.W.2d 385 (Ky. App. 1996).

In the present case, there is no evidence that Brockman engaged in outrageous conduct toward Plaintiffs. To the contrary, Brockman was performing his duties as a police officer, which, unfortunately, led him, because of Ramsey's actions, to use deadly force against her while Plaintiffs were passengers in her car. That conduct simply is not outrageous in light of the foregoing precedent.

Because Plaintiffs cannot establish the elements of their outrage claim, Brockman and Boone County are entitled to summary judgment.

## C.    DEPUTY BROCKMAN DID NOT NEGLIGENTLY CAUSE PLAINTIFFS ANY SEVERE EMOTIONAL DISTRESS

Because of its susceptibility to frivolous and conjured claims, the tort of negligent infliction of severe emotional distress is subject to a heightened standard of proof. *Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012). In addition to the usual elements of negligence, a plaintiff must also present proof that the emotional injury he sustained was severe or serious. *Id.* A serious or severe emotional injury occurs where a reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the case. *Id.* A plaintiff must present expert medical or scientific proof to support the claimed injury or impairment. *Id.*

Here, Plaintiffs cannot establish the usual elements of negligence. They cannot establish that Brockman breached any duty of care he owed them. Rather, Brockman was performing his duties as a police officer, when, unfortunately, because of Ramsey's actions, he was called upon to use deadly force against her while Plaintiffs were passengers in her

car. Because Brockman's actions were at all times reasonable, he did not breach any duty he may have owed to any of the Plaintiffs.

Moreover, assuming *arguendo* that Brockman was negligent, he is entitled to qualified official immunity. When sued in their individual capacities, public officers and employees enjoy qualified official immunity, which affords them protection from damages liability for good faith judgment calls made in a legally uncertain environment. *Yanero v. Davis,* 65 S.W.3d 510 (Ky. 2001). A public officer is entitled to qualified official immunity for discretionary acts or functions, made in good faith, and within the scope of the employee's authority. *Id.*

Qualified official immunity applies where the act performed by the official or employee is one that is discretionary in nature. *Haney v. Monskey,* 311 S.W.3d 235, 240 (Ky. 2010). Conversely, an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act. *Yanero,* 65 S.W.3d at 522.

A discretionary act or function is one that involves "the exercise of discretion and judgment, or personal deliberation, decision and judgment[.]" *Rowan County v. Sloas,* 201 S.W.3d 469, 477 (Ky. 2006). In addition, a discretionary act necessarily requires the exercise of reason in the adaption of a means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one of two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine which way it shall be performed. *Sloas,* 201 S.W.3d at 447 (citing *Collins v. Commonwealth of Ky. Nat'l Res. & Envtl. Prot. Cabinet,* 10 S.W.3d 122, 125 (Ky. 1999)).

A ministerial duty, on the other hand, is "one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Sloas,* 201 S.W.3d at 478 (citing *Yanero*, 65 S.W.3d at 522). For instance, enforcement of a known rule is a ministerial duty. *Sloas,* 201 S.W.3d at 478 (citing *Yanero,* 65 S.W.3d at 529).

In deciding to use force against Ramsey – the event that Plaintiffs claim caused them emotional distress – Deputy Brockman was engaged in a quintessentially discretionary decision. *Smith v. Norton Hospitals, Inc.*, 488 S.W.3d 23 (Ky. App. 2016) ("The determination of the amount of force required to effect the investigatory stop or arrest is likewise a discretionary act within the scope of a peace officer's authority."). <u>*See also*</u> *Nichols v. Bourbon County Sheriff's Department*, 26 F.Supp.3d 634 (E.D.Ky. 2014) (construing Kentucky law on qualified official immunity) (same); *Woolsey v. City of Paris*, 591 F.Supp.2d 913 (E.D.Ky. 2008) (construing Kentucky law on qualified official immunity) (decisions made by officer in using force "were clearly discretionary acts within the scope of his authority). Brockman had to evaluate all of the facts and circumstances that confronted him, determine whether he was entitled to use force and, if so, determine what type of force to use – the hallmarks of personal deliberation and judgment. Moreover, the decision to use force was undertaken within the scope of his authority as a police officer. Finally, there is no evidence that he made that decision in bad faith.

Consequently, assuming *arguendo* that Brockman was somehow negligent in the use of force against Ramsey, he is entitled to qualified official immunity and, therefore, summary judgment.

## VII. CONCLUSION

For the foregoing reasons, Defendants, Tyler Brockman, individually and in his official capacity as a Boone County Deputy Sheriff; Boone County, Kentucky; and, Michael Helmig, in his official capacity as the Boone County Sheriff, respectfully requests that this Court grant their Motion for Summary Judgment.

Respectfully submitted,

*/s/ Jeffrey C. Mando*
Jeffrey C. Mando, Esq. (#43548)
Louis D. Kelly, Esq. (#92094)
ADAMS, STEPNER,
WOLTERMANN & DUSING, PLLC
40 West Pike Street
Covington, KY 41011
859.394.6200
859.392.7263 – Fax
jmando@aswdlaw.com
lkelly@aswdlaw.com

*Attorneys for Defendants Tyler Brockman, individually and in his official capacity as a Boone County Deputy Sheriff; Boone County, Kentucky; and, Michael Helmig, in his official capacity as the Boone County Sheriff*

## CERTIFICATE OF SERVICE

This is to certify that on the **31st** day of October, 2016 I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to: Alphonse A. Gerhardstein, Esq.; Colleen M. Hegge, Esq.; Gary F. Franke, Esq.; Michael O'Neill, Esq.; and, Ryan J. Reed, Esq.

*/s/ Jeffrey C. Mando*
Jeffrey C. Mando, Esq.